**ROGERS et al. v. MARCHANT.**
**No. 4195.**

Circuit Court of Appeals, Fourth Circuit.

Aug. 6, 1937.

J. Stokes Salley, of Orangeburg, S. C., for appellants.

J. M. Brailsford, Jr., of Orangeburg, S. C. (Zeigler & Brailsford and William C. Wolfe, all of Orangeburg, S. C., on the brief), for appellee.

Before PARKER and SOPER, Circuit Judges, and HENRY H. WATKINS, District Judge.

SOPER, Circuit Judge.

By a decree of the District Court certain voluntary deeds of conveyance of real estate in the City of Orangeburg, S. C., were set aside upon the complaint of the receiver of the Orangeburg National Bank of South Carolina that Ella D. Rogers, the grantor, had made the conveyances with intent to hinder, delay, and defraud him in the collection of an assessment levied by the Comptroller of the Currency upon shares of the capital stock of the bank which she owned. This appeal questions the correctness of the decree.

On March 1, 1927, runs on the bank had so depleted its cash resources that it became necessary to take some action to protect the depositors. On that day, upon the recommendation of the Comptroller of the Currency that the bank was solvent, an agreement was made between it and the Edisto National Bank, also located in Orangeburg, whereby the Edisto Bank assumed the liabilities of the Orangeburg Bank in consideration of the cash sum of $100,000, the conveyance of the banking house of the Orangeburg Bank at a valuation of $75,000, bonds, stocks, other cash, etc., of the Orangeburg Bank, amounting to $327,628.08, and certain notes held by the Orangeburg Bank of the face value of $262,224.72, together with a note of the Orangeburg Bank payable to the Edisto Bank in the sum of $710,198.14 representing the difference between the value of the assets transferred and the total liabilities of the Orangeburg Bank amounting to $1,481,048.94. This note was secured by the assignment to the Edisto Bank of a note of the General Land & Investment Company for $768,808.73 secured by real estate and real estate loans, in the sum of $868,808.73, which had been transferred by the Orangeburg Bank to the company in consideration of its note and the cash sum of $100,000; and the note of the Orangeburg Bank to the Edisto Bank was also secured by the assignment or pledge of all the remaining assets of the Orangeburg Bank of the aggregate face value of $249,448.62. The General Land & Investment Company had been formed to facilitate the liquidation of the real estate holdings of the Orangeburg Bank, and the cash sum of $100,000 had been raised for the most part by subscriptions to the capital stock of the company by stockholders of the Orangeburg Bank.

The Edisto Bank agreed to liquidate all the assets transferred directly to it except the banking house and all assets held by it as collateral to the deficiency note of the Orangeburg Bank; and it was agreed that the proceeds of liquidation should be applied (1) to the reimbursement of the Edisto Bank for any loss sustained by it in the collection of the assets; (2) to the payment of the deficiency note; and (3) to the payment of any balance remaining to the Orangeburg Bank. The Edisto Bank agreed to pay all the liabilities of the Orangeburg Bank except the statutory liability of the stockholders of the Orangeburg Bank. The General Land & Investment Company entered into a contract with the Orangeburg Bank to liquidate the assets transferred to it and employ the proceeds in discharging its obligation to the Orangeburg Bank after deducting costs and commissions.

When these agreements were made, Mrs. Rogers was the owner and holder of 86 shares of the stock of the Orangeburg Bank. She subscribed to $2,500 of the stock of the General Land & Investment Company. At that time it was clear that the Orangeburg Bank could not meet its obligations as they matured, but it was believed by the two banks and the Comptroller that the assets of the Orangeburg Bank, if liquidated in an orderly manner, would prove more than sufficient to pay its debts; and the stockholders believed that the purchase by them of $100,000 of stock in the Investment Company under the circumstances described would render unnecessary any assessment upon their stock in the bank and would constitute an investment upon which they might reasonably expect a return.

On October 12, 1928, nineteen months later, Mrs. Rogers made the three deeds in question. She conveyed an undivided one-third interest in her real estate in Orangeburg, constituting substantially all of her property, to each of three persons, that is, one-third to a daughter absolutely; one-third to the daughter in trust for the child of a deceased son; and one-third to a daughter-in-law. No consideration passed from the grantees other than an oral agreement on their part, not ex-

pressed in the deeds, that the grantor should have the income from the property as long as she lived. Rents in the annual sum of $600 were actually paid to the grantor under this agreement. There was evidence which led the master to conclude that the motive for the transfer in addition to the enjoyment of the income was the desire to give the grantees shares of her estate equal to advancements previously made by her to her other children, and to protect herself from indorsements for members of her family which she might otherwise be called upon to make. Both the special master and the District Judge held that at the time the Orangeburg Bank was actually engaged in the liquidation of its assets and was solvent, and that no actual fraud was intended by the parties to the conveyances.

On April 8, 1931, two and a half years later, a receiver for the Orangeburg Bank was appointed; and on July 3, 1931, a 100 per cent. assessment on the stock of the Orangeburg Bank was levied by the Comptroller of the Currency. On June 15, 1936, the receiver recovered a judgment in the District Court against Mrs. Rogers for the amount of her assessment with interest and costs in the sum of $11,417.69 and an execution thereon was returned unsatisfied. Thereupon the present suit attacking the conveyances was filed, resulting in a decree that they were invalid and of no effect. The court was of the opinion that a stockholder of a bank in course of liquidation may not avoid his stockholder's liability by a voluntary transfer of all of his property during the liquidation, although at the time of the transfer the bank is solvent.

The case turns upon the proper application of section 8696 of the South Carolina Code of 1932 concerning conveyances in fraud of creditors wherein the Statute of Elizabeth, 13 Eliz. c. 5, was enacted into the statute law of the state. The general rule under the statute is that fraudulent intent on the part of the grantor is necessary to bring a conveyance within its terms, but such an intent will be inferred when a conveyance is made under such circumstances that it will necessarily hinder and delay creditors, as for instance, when a voluntary conveyance of all of his property is made by a debtor. Hessian v. Patten (C.C.A.) 154 F. 829; Hursey v. Lane (C.C.A.) 238 F. 913; and this is the rule

in South Carolina. See Jackson v. Lewis, 34 S.C. 1, 7, 12 S.E. 560, 562, where it was said: "The law will not permit one who is indebted at the time to give his property away, provided such gift proves prejudicial to the interest of existing creditors. The motive which prompts the donor to make the gift is wholly immaterial. If the donor is indebted at the time, and the event proves that it is necessary to resort to the property attempted to be conveyed away by a voluntary deed for the purpose of paying such indebtedness, the voluntary conveyance will be set aside, and the property subjected to the payment of such indebtedness, upon the ground that it would otherwise operate as a legal fraud upon the rights of creditors, even though it might be perfectly clear that the transaction was free from any trace of moral fraud."

So also it is an established rule in the law of fraudulent conveyances that the rights of a creditor, whose claim is contingent at the time of the transfer, are as fully protected as those of one whose claim had been accrued. This rule also seems to prevail in South Carolina. Hill v. Calvert (1844) 1 Rich.Eq.(18 S.C.Eq.) 56; Lowry v. Pinson (1831) 2 Bailey (18 S.C.Law) 324, 23 Am.Dec. 140; Godbold v. Lambert (1856) 8 Rich.Eq. (29 S.C.Eq.) 155, 70 Am.Dec. 192. See, also, Taylor v. Heriot (1812) 4 Desaus. (4 S.C.Eq.) 227. Cf. Henderson v. Dodd (1830) 1 Bailey, Eq.(8 S.C.Eq.) 138. But even if it be considered that these decisions do not clearly establish what the state law on the point is, it would still be our duty to apply the rule as in our independent judgment we find it to be. Edward Hines Yellow Pine Trustees v. Martin, 268 U.S. 458, 45 S.Ct. 543, 69 L. Ed. 1050.

It is said in American Surety Co. v. Marotta, 287 U.S. 513, 518, 53 S.Ct. 260, 262, 77 L.Ed. 466, that "under the common-law rule a creditor having only a contingent claim * * * is protected against fraudulent conveyance." The rule has been frequently applied in cases involving the contingent rights or liabilities of sureties, indorsers of notes and guardians, American Surety Co. v. Marotta, supra; Thomson v. Crane (C.C.) 73 F. 327; Trachten v. Boyarsky, 122 Conn. 465, 190 A. 869; also to the contingent liability for court costs, Daniels v. Goff, 192 Ky. 15, 232 S.W. 66; for torts, Babirecki v. Virgil, 97 N.J.Eq. 315, 127

A. 594, 39 A.L.R. 175 and cases cited; and for a fine or penalty in a criminal case, Pierce v. United States, 255 U.S. 398, 41 S.Ct. 365, 65 L.Ed. 697. The Uniform Fraudulent Conveyance Act in section 1 defines a "creditor" as a person having any claim, matured or unmatured, liquidated or unliquidated, absolute, fixed or contingent.

The question in the pending case is whether the liability of Mrs. Rogers as a stockholder of the bank at the time of the transfer was sufficiently definite or imminent to be recognized as a contingent liability within the rule. The individual responsibility of the stockholder of a national bank for the debts of the bank to the extent of the amount of his stock in addition to the amount invested in the shares is created by statute, 12 U.S. C.A. §§ 63 and 64; but it is nevertheless quasi contractual in its origin and basis, since it comes into being through the acquisition of the stock. Hence it has been held that the liability, though secondary and not that of a surety, is provable in bankruptcy before assessment as one arising upon an implied contract. Brown v. O'Keefe, 57 S.Ct. 543, 548, 81 .Ed. 827; Matteson v. Dent, 176 U.S. 521, 20 S.Ct. 419, 44 L.Ed. 571; McClaine v. Rankin, 197 U.S. 154, 161, 25 S.Ct. 410, 49 L.Ed. 702, 3 Ann.Cas. 500. While the cause of action for the superadded liability does not ordinarily accrue until an assessment is made by the Comptroller of the Currency, Forrest v. Jack, 294 U.S. 158, 55 S.Ct. 370, 79 L.Ed. 829, 96 A.L.R. 1457, the liability comes into being upon the subscription to the stock or upon its receipt and acceptance. Deweese v. Smith (C.C.A.) 106 F. 438, 66 L.R.A. 971.

Whether or not in the event of a transfer the contingency upon which a stockholder's liability will become due and owing is sufficiently imminent to form the basis for an attack upon the conveyance or, on the other hand, is so remote that an attempt to defraud on the part of the grantor should not be inferred, necessarily depends upon the particular facts of the case. In considering the probability of such a claim in bankruptcy, in Brown v. O'Keefe, supra, Justice Cardozo said that "what infusion of contingency will vitiate a claim is at best a question of degree"; and in Glenn on Fraudulent Conveyances, §§ 327 to 339, it is suggested that the length of time elapsing between the conveyance and the breach or warning of the possibility of the breach of the obligation is a pertinent fact in determining whether the holder of the contingent obligation should be regarded as a present creditor.

Relatively few cases seem to have dealt with the question of voluntary conveyances by stockholders of a bank subject to a liability for assessment upon their stock. See those cited in the note to Peterson v. Wahlquist, 125 Neb. 247, 249 N.W. 678, 89 A.L.R. 747 to 751; and also, Hendrickson v. Helmer (D.C.) 7 F. Supp. 627, and In re Barbee's Estate, 182 Wash. 644, 47 P.(2d) 1023. Voluntary transfers after insolvency of the bank but before assessment upon the stock were set aside in Williams v. Travis (C.C. A.) 277 F. 134, Yardley v. Torr (C.C.) 67 F. 857, and Duncan v. Freeman, 152 Ga. 332, 110 S.E. 5; but differences have arisen in the decisions in cases in which the transfers were made prior to insolvency. The contingent liability was recognized as existing even at this time in Peterson v. Wahlquist, supra, and In re Barbee's Estate, supra; but in Hendrickson v. Helmer, supra, and Gormley v. Askew, 177 Ga. 554, 170 S.E. 674, the opposite conclusion was reached. See the comment on Peterson v. Wahlquist in 34 Columbia Law Review, 373, 374; 19 Iowa Law Review, 121, 122.

We have no occasion in the pending case to take a position at either extreme. While the bank, according to the findings of the master and of the District Judge, was not insolvent when the deeds of conveyance were made, it was then closed and for nineteen months had been in process of liquidation. The stockholders had been compelled to subscribe $100,000 to induce the Edisto Bank to assume the liabilities and liquidate the assets of the closed bank; and although the stockholders were still confident that no assessment upon their stock would be required, the warning had been given by unfavorable circumstance. There was no certainty that sufficient monies would be collected to pay the debts; the contingency upon which the liability might accrue was not so remote as to be immaterial; and the stockholder was not justified in making a gift of all of her property without making provision for the liquidation of her liability, should it actually accrue.

Affirmed.